THE JERSEY LAND COMPANY, a corporation, complainant-respondent,

*v.*

WILLIAM O. GUNZENHAUSER and COMMERCIAL CASUALTY INSURANCE COMPANY et al., defendants-appellants.

[Decided January 10th, 1935.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"Complainant's bill is to foreclose a mortgage of $44,000 made to it by defendant Gunzenhauser. As to $29,000 thereof, it was a purchase-money mortgage. As to the other

$15,000, it was an advance-money mortgage to finance the erection of a public garage on the mortgaged premises; under it some $5,000 was actually advanced and applied toward the erection of the building. No issue arises under the bill itself; the issues arise under a counter-claim filed by Commercial Casualty Insurance Company, the surety on the bond given by the contractors for the erection of the garage.

"There is little dispute as to the facts in evidence; the question is as to the inferences to be drawn therefrom.

"Complainant and defendant Gunzenhauser on May 19th, 1931, contracted in writing for the sale and purchase of the premises in question at the price of $30,000 for which Gunzenhauser was to give a three months' note for $1,000 and a bond and mortgage for $29,000, payable in six months from date. Gunzenhauser agreed to erect a public garage on the premises in accordance with specified plans, and complainant agreed to advance $15,000 to Gunzenhauser for the purpose, on an advance-money mortgage in addition to the $29,000 mortgage.

"The deed and the bond and mortgage were exchanged. All bear date May 21st, 1931, and the bond and mortgage mature by their terms on November 21st, 1931. Both deed and mortgage were not acknowledged until June 2d, 1931, and were not recorded until June 10th, 1931, at two-fifty P. M.

"On June 10th, 1931, Gunzenhauser, as owner, and Lorenz & Haase, as contractors, executed a contract for the erection of the public garage, for the sum of $18,962, payable $5,000 when walls ready for trusses, $4,000 when roof completed, $4,000 when building completed and accepted; $2,000 in thirty days thereafter, and $3,982 in sixty days after completion and acceptance.

"This contract was recorded the following day.

"Within a few days, Lorenz & Haase commenced the construction of the building, and proceeded with it. By, or before, the end of June, Gunzenhauser had alterations made in the plans, which added an expense of nearly $4,000 to the

cost of the building. This was after the first payment of $5,000 was due under the contract—and this $5,000 was advanced by the Jersey Land Company under the advance-money mortgage to Gunzenhauser, and by him paid to the contractors.

"The contractors then sought to get immediate payment for the extra work. The Jersey Land Company refused to advance it to Gunzenhauser, and the contractors were unable to get it from Gunzenhauser. They therefore abandoned the contract and refused to complete it. This was toward the middle of July. The usual three days' notice was served on the contractors, and was also given to the surety company.

"The surety company took up negotiations with the several parties and their counsel. They sought to make a payment in settlement for release from the bond, but this was not acceptable, and finally at, or after, the middle of September, the surety company undertook to complete the work.

"The building was not completed until at least March 1st, 1932 (the date when the architect issued his final certificate).

"Meanwhile, complainant's mortgage had matured due on November 21st, 1931, and about March 1st, 1932, it requested payment from Gunzenhauser of the principal of $34,000 (the $29,000 plus the $5,000 actually advanced) and interest; and some weeks later it filed its bill to foreclose.

"It appears that Gunzenhauser was to some extent responsible for the delay in the completing of the work by the surety company—by reason of the delay on his part of the doing of plumbing and heating work not covered by the Lorenz & Haase contract.

"The surety company's counter-claim charges that the fair value of the mortgaged premises was only ten or twelve thousand dollars; that the contract of sale, deed, bond and mortgage were all a part of a fraudulent conspiracy between the Jersey Land Company and Gunzenhauser, for the purpose of obtaining, without substantial cost, the erection of the garage building.

"The answers by Gunzenhauser and complainant, to this counter-claim, deny the allegations of fraud.

"In my judgment the proofs fall far short of establishing the fraudulent conspiracy alleged, or of establishing any fraud on the part of complainant. The most that can be said is that it is possible that such a fraudulent conspiracy was made and carried out. This, of course, is insufficient. Fraud must be proven—at least to the extent of satisfying the mind of the court that in all probability it took place. The mere possibility of fraud is insufficient to warrant adjudication of fraud.

"My own belief, after consideration of all of the testimony and evidence, is that there was no fraudulent conspiracy between complainant and Gunzenhauser. In any event, considering all of the testimony and evidence objected to by complainant, and excluding all of the testimony and evidence objected to by the surety company, I am entirely satisfied that the proofs fail to establish the alleged fraud.

"One of the chief factors relied upon by the surety company is the allegation of over-valuation of the mortgaged premises, and the consequent result of a mortgage on the premises, ahead of any rights which the contractors could acquire in such premises, in an alleged excessive amount.

"On an issue of this kind, the sale price agreed upon between complainant and Gunzenhauser is, of course, not conclusive as to the value of the property. I am inclined to think that the price of $29,000, at the time (the depression period was already under way), was a high price.

"It appears, however, that in 1925 complainant had made a sale of the same property to one Portnoff for the price of $26,000 and that at that time the lot had no frontage on any public street, and access thereto was by means of a strip thirteen feet wide and one hundred feet long, running in from Park avenue at one corner of the lot. At the time of the sale to Gunzenhauser, a new street, Spring street, had been cut through from Park avenue, so that the lot in question fronted on this new street. This situation obviously would materially raise the value of the property—both because of the greater convenience of access into the garage directly from the street, and because the entire lot could be utilized

for the garage without having to reserve a portion of it in order to permit access to the building from the end of the entrance strip or alley.

"The sale to Portnoff was conditional upon the ability to obtain the right to erect the proposed garage (under zoning ordinances), and was not consummated because of the failure to obtain that right. At the time of the sale to Gunzenhauser that right had been obtained.

"Moreover, consideration would indicate that even at the price of $30,000, plus an additonal $20,000 for construction of the garage, the project might well be made to pay. The tract had a frontage of one hundred and twenty-six feet and a depth of one hundred and fifteen feet, and afforded ample room to house at least fifty cars; and in addition to the rental of garage space, there would be profit derived from sale of gas, oil and accessories.

"Stress is also laid upon what is termed the concealment of the mortgage. It is true that neither the deed nor the mortgage had been put on record at the time that Lorenze & Haase were estimating on the contract; and the proofs do not show the reason for the delay in recording the deed and mortgage from the actual acknowledgment and delivery thereof on June 2d, until June 10th. However, the surety company did not cross-examine the complainant's president in this regard; and it is at least a possible inference that the actual putting through of the purchase and sale was conditioned upon Gunzenhauser's being able to obtain the erection of the garage within a specified or reasonable amount. The burden of proving the alleged fraud is, of course, upon the counter-claimant; it is not for the complainant to disprove it.

"As against the theory of fraud there is the fact that Lorenz & Haase had independent counsel at the time they entered into the contract; that they knew that the deed and the mortgage had not been placed on record at the time the contract was signed; that they knew that there was a mortgage; that their counsel investigated the records before they started the work, to make sure the deed was on record, but

made no investigation whatever as to encumbrances; and that the contractors did not rely upon the property, in making the contract, but upon their own investigation of, and belief in, Gunzenhauser's financial responsibility. This latter is the testimony of Lorenz, one of the members of the contracting firm.

"Moreover, it also appears from the testimony of the contractors themselves that complainant had nothing to do, so far as they were concerned, with the changed plans and the extra work; that they themselves agreed upon this with Gunzenhauser alone.

There is no evidence as to what the surety company relied upon in entering into the bond; certainly, there is nothing whatever to show they relied upon the state of the title to the premises, or that they ever made any investigation as to that, or that any representations whatever were made to them by complainant.

"Moreover, Mr. Moran, of the surety company, testified that the surety company, before undertaking the completion of the contract, knew that there was a mortgage upon the premises, but didn't look it up. The surety company also certainly knew that Gunzenhauser himself was to do the plumbing and heating work, because that is specifically expressed on the face of the Lorenz & Haase contract.

"The third point contended for by the surety company is that complainant and Gunzenhauser were responsible for the long delays in the completion of the building, so that it was not completed until after the maturity of the mortgage.

"So far as the changed plans caused any delay, the surety company, as is shown by the evidence, knew of the changed plans, before they undertook the completion of the job. The evidence also shows that the first delay was caused by Lorenz & Haase abandoning the job without legal cause or justification, that there was further delay by the surety company for some two months, from the middle of July to the middle of September, before they undertook to complete the job, and that there was still further, and very considerable, delay caused by the fact that Lorenz & Haase had used defective

brick in the construction of the building, and that the removal of these bricks and replacement with others was delayed for a considerable time by the surety company after the surety undertook the completion of the job.

"In addition, it not only appears that complainant did not ask for payment of its mortgage until some three months after the date of maturity, but that it also delayed filing the bill for several weeks, after making demand for payment, in order to give Gunzenhauser time, at his request, to endeavor to refinance the property.

"The evidence, therefore, fails to show any fraudulent representations or concealments; it further fails to show any intent on the part of complainant to defraud the contractors or the surety company, or anyone else; and finally, whatever may have been the action or the intent of the complainant, the evidence clearly shows that neither the contractors nor the surety company relied upon anything done or said by the complainant, or was induced to do or to refrain from doing, anything by reason of any action or statements of the complainant.

"The surety company is entitled to no relief against complainant upon its charge of fraud.

"Mr. Gordon, the president of complainant, testified on the cross-examination that after the contractors had abandoned the job, and the surety company had been called upon, Mr. Moran, of the surety company, asked him, 'if we perform, how about our money?' 'I said, "O. K., I will pay out the money, the balance of the advanced-money mortgage." ' Q. 'Yes?' A. 'If they immediately proceed and finish it.'

"I had some doubt as to whether an equity might not have been raised in favor of the surety company, by reason of this fact; but I conclude to the contrary. This was not a promise to pay to the surety company the balance of the advance moneys, in all events—nor to do so otherwise than in accordance with the terms of the mortgage and of the building contract. And there is no evidence whatever that the surety company so construed it, or relied upon it. Moreover, the condition—that the surety company immediately proceed and

finish the job—was not complied with. There was delay in commencing the completion, and there was still further delay of the surety company in completion.

"The obligation of the mortgagee to make the construction payments is a contractual obligation with the mortgagor, Gunzenhauser. That obligation terminated with the maturity of the mortgage debt. The mortgagor could then no longer compel such payment; whatever rights or equities the surety may have can only come to them through the mortgagor, and hence the surety company has no right to compel the payment of the balance of the advance moneys. *Bloomfield Bank and Trust Co.* v. *Temple B'Nai Zion, 113 N. J. Eq. 449.*

"The surety company also contends in the alternative that it is entitled to a mechanics' lien, or a lien in nature of a mechanics' lien, upon the mortgaged premises, or the expense of its completion of the contract.

"A mechanics' lien, under the statute, can be acquired only by the contractor; the surety company could acquire no right of any such nature other than through the contractor, upon the theory of subrogation to the contractor's right. There was no contract between the surety company and the owner, or between the surety company and the mortgagee. The contractor is entitled to no such equity, because the proofs show that he breached the contract without justification, both by abandoning the contract, uncompleted, and by defective work.

"It is not perceived that the surety company has any mechanics' lien, or any equity, in the nature of any such lien, under the proofs. Moreover, if it were to be assumed that it did have, such right would be subordinate to the rights of the complainant under the mortgage. Even the mechanics' lien of the contractors—if they had a mechanics' lien—would be subordinate to the lien of the mortgage, under the terms of the statute.

"The result is that even though the mortgagee, if it is compelled to, and does, buy in the property at foreclosure sale, will have the benefit of the $18,000 or $20,000 building at a cost of only $5,000. That is a situation which results

from no causes which entitle the surety company, or anyone else, to legal or equitable relief therefrom.

"The counter-claim must be dismissed as against the complainant; but under the circumstances mentioned, I think it should be without costs. Complainant is already the recipient of a very considerable benefit, for which (although it be legally and equitably entitled to retain it) it has paid nothing.

"As to whether or not any decree should be, or can be, entered in favor of the surety company against the defendant Gunzenhauser, I have not considered. The pleadings are not before me at the moment's writing, and this question was not argued either orally, or in the briefs."

*Messrs. Williams & Leonard (Mr. Lester C. Leonard,* of counsel), for the appellant.

*Messrs. Bilder, Bilder & Kaufman (Mr. Samuel Kaufman* and *Mr. Daniel G. Kaṣen,* of counsel), for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated by the opinion delivered by Vice-Chancellor Buchanan in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 13.

*For reversal*—None.